DEREK J. MEYER (CA Bar No. 278346)
rmeyer@leonardmeyerllp.com
JOHN G. BISBIKIS (admitted *pro hac vice*)
jbisbikis@leonardmeyerllp.com
**LEONARDMEYER LLP**
10250 Constellation Blvd., 14th Floor
Los Angeles, CA 90067
Telephone:  (310) 220-0331

*Attorneys for Counter-Plaintiffs*
*Michael S. Berlin, M.D. and EyeLight, Inc.*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| ELT SIGHT, INC. and ELLIOT FRIEDMAN,<br><br>                    Plaintiffs,<br><br>                                        vs.<br><br>EYELIGHT, INC., and MICHAEL S. BERLIN,<br><br>                    Defendants.<br>_____<br><br>MICHAEL S. BERLIN, M.D.; and EYELIGHT, INC., a California Corporation,<br><br>                    Counter-Plaintiffs,<br>                                        vs.<br><br>ELLIOT FRIEDMAN and ELT SIGHT, INC., a Delaware Corporation.<br>                    Counter-Defendants.<br>_____ | CASE NO. 2:19-cv-05545-JAK-RAO<br><br>HONORABLE JOHN A. KRONSTADT<br><br><br>**FIRST AMENDED COUNTERCLAIM**<br><br><br>**JURY TRIAL DEMANDED**<br><br><br><br><br>Action Filed:  June 25, 2019<br>Trial Date:  None |

- 1 -

Defendants/Counter-Plaintiffs Michael S. Berlin, M.D. ("Dr. Berlin") and EyeLight, Inc. ("EyeLight") (collectively, "Counter-Plaintiffs"), by and through their undersigned counsel, state as follows for their First Amended Counterclaim against Plaintiffs/Counter-Defendants Elliot Friedman ("Friedman") and ELT Sight, Inc. ("ELT Sight") (collectively, "Counter-Defendants"):

<strong><u>PARTIES</u></strong>

1.      Dr. Berlin is a citizen of the State of California, and resides in Los Angeles, California.

2.      EyeLight is a California corporation, and its principal place of business is located in Los Angeles, California.

3.      Friedman is a citizen and resident of the State of Florida.

4.      ELT Sight is a Delaware corporation and, on information and belief, its principal place of business is Los Angeles, California.

<strong><u>JURISDICTION AND VENUE</u></strong>

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.  This court has supplemental jurisdiction over the state law causes of action pursuant to 28 U.S.C. § 1367(a) because they are sufficiently related to claims in the action within such original jurisdiction that they form part of the same case or controversy.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Counter-Plaintiffs' claims have occurred, are occurring or will occur in this judicial district.

7.      This Court has personal jurisdiction over Friedman and ELT Sight by virtue of, among other things, their commission of tortious acts within the State of California in this District, their transaction of business within the State of California in this District and, with respect to ELT Sight, its principal place of business in Los Angeles, California.  In addition, Friedman and ELT Sight commenced this action in this District and consented to the jurisdiction of this Court.

# BACKGROUND

### A.    Glaucoma

8.    Glaucoma is a group of eye diseases in which  damage to the optic nerve   causes irreversible, permanent vision loss.  Globally, glaucoma affects more than 60.5 million people currently and is projected to effect nearly 80 million people by 2020.  An estimated 3-6 million people in the United States have glaucoma or ocular hypertension.   Due to the aging of the "Baby Boomer" generation, this number is expected to increase substantially.

9.    Open-angle glaucoma is the most common form of glaucoma and the second leading cause of blindness.

10.    Risk factors for glaucoma include increased pressure in the eye which can cause optic nerve damage.  The goal of glaucoma treatments is to decrease eye pressure.

11.    Surgical treatment of glaucoma often involves making a new opening(s) in a part of the eye called the trabecular meshwork.   Creating an opening(s) in this meshwork enables improved egress of fluid from the eye and lowers intraocular pressure ("IOP").

12.    Elevated IOP is the primary treatable risk factor for open-angle glaucoma.   Elevated IOP damages the optic nerve irreversibly and causes progressive and permanent vision loss.

13.    Current glaucoma treatment options are costly and inadequate.  For example, current treatment with medications is both expensive and often ineffective due to lack of ongoing use compliance and adherence.  Current office-based laser treatments have diminished effectiveness over time and cause thermal damage to the eye.  Invasive surgery, called trabeculectomy, in which large surgical openings are created through the full thickness of the eye, can cause damage to eye, lifestyle limitations and also often require ongoing drug compliance.

14.     The largest future growth market in glaucoma  is in a treatment segment called Minimally Invasive Glaucoma Surgery ("MIGS").

**B.      Excimer Laser Trabeculostomy**

15.     Excimer Laser Trabeculostomy ("ELT") is a clinically proven, minimally invasive, long-lasting MIGS procedure for the treatment of open-angle glaucoma.

16.     ELT involves placing a small fiberoptic probe in contact with the trabecular meshwork in the eye to deliver non-thermal excimer laser pulses.  These laser pulses create a channel to allow for drainage of the eye's aqueous fluid, thereby lowering IOP without damaging the outer wall of the eye.  ELT has been called   "LASIK" of the trabecular meshwork because the excimer lasers used for both ELT and LASIK remove tissue by converting the tissues into gas without causing scarring or provoking healing such that the pathways/channels remain open to relieve elevated IOP on an on-going basis.

17.     Alternatives to creating such drainage channels with ELT are the use of stent implants.  The current market-leading MIGS procedure is the implantation of tiny stents into the eye.  Stent implants present significant safety issues, including stent clogging over time, inadvertent movement of the stents within the eye, and trauma associated with their insertion.  ELT, being laser-based with no stents, eliminates these issues and thereby beneficially enables long-term, IOP reduction without stent implants.

18.     The ELT procedure takes less time, requires fewer patient follow-up visits, and has a more predictable long-term reduction in IOP than current full thickness hole-based trabeculectomy procedures.  The recovery time for ELT is one to two weeks, compared with up to ten weeks for other surgical treatment options.

19.     The ELT technology pioneered by Dr. Berlin has been approved for use in Europe under CE mark for over ten years.  The CE mark is a legal requirement to place a device on the market in the EU.

- 4 -

20.     ELT has been performed on over 5,000 patients in Europe.

21.     The MIGS business in the United States is anticipated to grow substantially.

**C.     Dr. Michael Berlin and EyeLight, Inc.**

22.     Dr. Berlin is a board-certified ophthalmologist specializing in laser surgery and in the research and treatment of glaucoma.  He is founder and director of the Glaucoma Institute of Beverly Hills, as well as a professor of clinical ophthalmology at the UCLA Jules Stein Eye Institute.

23.     Dr. Berlin invented and has been instrumental in developing the ELT procedure, technology and public and professional awareness.  For several decades he has been introducing ELT to European ophthalmic surgical specialists who have been performing this procedure there. In many cases, he has personally trained these surgeons in how to use the excimer laser and in how to perform the ELT procedure. In addition, he has been subsequently collecting and analyzing data from them regarding their patients' outcomes.

24.     Dr. Berlin has held, and still holds, numerous patents and patents pending related to the ELT procedure and  associated equipment and devices.  He also invented intraocular stent devices used in the treatment of glaucoma, for which he was also granted numerous patents.

25.     Dr. Berlin's portfolio of patents includes patents for the method and equipment currently used to perform ELT, which is referred to as "Generation 1". To date, with the Generation 1 concepts and devices, the ELT procedure has proven to be safe and effective but has been adopted into practice by a relatively small number of elite specialists in Europe.

26.     Dr. Berlin also holds patents, has patents pending and has filed provisional patents for what is referred to as "Generations 2 and 3" ELT procedures and devices.

- 5 -

FIRST AMENDED COUNTERCLAIM

27.     Generations 2 and 3 ELT add guidance systems and robotics involving optical based guidance (Gen 2, 2D) and Optical Coherence Tomography ("OCT") based guidance (Gen 3, 3D) technology which enables automation.  These guidance systems will make it easier to position the probe in the eye and better control the laser penetration of the trabecular meshwork, which will enable safe and consistent outcomes by a significantly greater number of ophthalmic surgeons rather than only by elite specialists.  The Generations 2 and 3 technologies will dramatically expand the market size for ELT.

28.     EyeLight is the business entity that Dr. Berlin founded in 2004 to commercialize the ELT procedure and related technological innovations.

29.     EyeLight, as a pioneer in innovative ophthalmic technologies, has a pipeline of additional technologies to further improve and standardize MIGS surgery and other glaucoma diagnostic and surgical technologies.

30.     EyeLight's path to commercialization depends in part on obtaining U.S. FDA approval which requires conducting clinical trials of Generation 1 ELT in the U.S.  Dr. Berlin and EyeLight have developed a confidential strategy to obtain Gen 1 FDA approval including confidential information regarding such clinical trials and subsequent FDA regulatory pathways for Gens 2 and 3.

**D.     MLase**

31.     MLase, AG ("MLase") is a German company that manufactures an excimer laser used to perform Gen 1 ELT surgery in Europe.

32.     Prior to 2018, and given that patents are held by Dr. Berlin in the United States, MLase had confined its business to Europe.

33.     Prior to 2018, in order to move forward with EyeLight's plans in the U.S. and Canada, Dr. Berlin and EyeLight sought rights to purchase MLase's ELT related products and/or to acquire MLase's ELT related business.

### E.   Competitively Sensitive Information

34.   By virtue of Dr. Berlin's experience and work in both the MIGS space and especially in the development of ELT, Dr. Berlin and EyeLight possess competitively sensitive information, including information of a confidential, proprietary or trade secret nature, which they developed at great expense over many years and which derives economic value by not being generally known to competitors and others who could benefit from its use or disclosure.

35.   This includes, without limitation:

a. Decades of individualized ELT patient surgical monitoring, procedure reviews and the collection of patient related data reflecting detailed analyses of the technique and the long-term efficacy of the procedure;

b. Information as to the identities of EyeLight's clinical physician researchers and scientific advisors;

c. Information on the proper clinical and surgical protocols and techniques for use of the excimer laser;

d. EyeLight's business models, financial projections, and pricing;

e. EyeLight's and Dr. Berlin's patent strategies and other intellectual property strategies;

f. EyeLight's clinical and regulatory strategies, including strategies for approvals by the U.S. Food and Drug Administration and also clinical and regulatory strategies for ex-USA approvals and use;

g. EyeLight's plans to obtain Generation 1 and Generations 2 & 3 laser systems and disposables, including competitively sensitive analyses of different options, associated costs and timelines, and how these would impact its ability to compete - including, as is discussed below, analyses related specifically to MLase; and

h. Communications and analyses regarding how the foregoing factors impact EyeLight's ability to compete and gain first entry in the U.S.

FIRST AMENDED COUNTERCLAIM

market, including, as is discussed below, competitive strategic analyses specifically related to MLase.

36. Counter-Plaintiffs have used various methods to safeguard the confidentiality of their information, including: limiting disclosure of certain information to parties who have agreed to maintain its confidentiality, including the use of confidentiality or non-disclosure agreements in many cases; labeling certain information as confidential; having employees agree to confidentiality policies and procedures; and storing certain information in a secure information technology environment.

**F.     Elliot Friedman**

37. Elliot Friedman is a consultant who claims to specialize in commercializing medical device innovations.

38. Dr. Berlin met Friedman in the Summer of 2017.

39. At the time he met Berlin in 2017, Friedman held himself out as chairman of Qi Jian Funds, LTD. ("Qi Jian Funds").

40. According to Friedman, Qi Jian Funds invested in health science companies that emerge from Southern California universities and health centers. He further claimed that he and Qi Jian Funds had performed work to commercialize transformational medical technologies.

41. According to Friedman, the areas of business with which he had experience included developing and revising protocols, packaging research data, patents, securing support from major hospitals and world leading Principal Investigators, financing, and working with market leaders.

42. Friedman represented to Dr. Berlin that he could enable EyeLight to grow, attract investors, and position the company for a sale.

43. Prior to working with Dr. Berlin and EyeLight, Friedman had never worked in any aspect of ophthalmology.

44.     Prior to working with Dr. Berlin and EyeLight, Friedman had no professional experience involving glaucoma-related devices.

45.     Prior to working with Dr. Berlin and EyeLight, Friedman had no professional experience involving glaucoma-related business matters.

46.     Prior to working with Dr. Berlin and EyeLight, Friedman had no professional experience involving glaucoma.

47.     Prior to working with Dr. Berlin and EyeLight, Friedman had never worked in the MIGS space.

48.     Prior to working with Dr. Berlin and EyeLight, Friedman had never worked in the ELT industry.

49.     Prior to working with Dr. Berlin and EyeLight, Friedman was not aware of MLase.

### G.     Confidentiality Agreement

50.     Dr. Berlin and EyeLight provided Friedman with a confidentiality agreement. Friedman signed this confidentiality agreement on behalf of himself and Qi Jian Funds on August 30, 2017 ("Confidentiality Agreement").

51.     A true and correct copy of the Confidentiality Agreement is found at Dkt. 34-1 and incorporated by reference herein.

52.     Only much later did Friedman admit that "Qi Jian Funds, LTD." was never formed as a business entity.

53.     In general, pursuant to the Confidentiality Agreement, Friedman and Qi Jian Funds agreed to, among other things, hold Dr. Berlin and EyeLight's confidential and proprietary information in strict confidence and to not use or disclose it except in furtherance of the parties' potential business relationship.

### H.     Initial Relationship In The Fall of 2017

54.     Following Friedman's execution of the Confidentiality Agreement on behalf of himself and of Qi Jian Funds, Dr. Berlin and EyeLight began disclosing

information to Friedman, including information of a confidential, proprietary or trade secret nature over the course of September and October 2017.

55.   This information included, but was not limited, information relating to:

a.   The identities of EyeLight's clinical physician researchers, scientific advisors, and Key Opinion Leaders ("KOL's");

b.   The identities of potential investors;

c.   The identities of potential commercial partners such as MLase;

d.   business models, financial projections, and pricing;

e.   patent strategy and other intellectual property strategies;

f.   clinical and regulatory strategy, including strategy with the U.S. FDA;

g.   strategically important information regarding EyeLight's options for sourcing or developing in-house the lasers and fiber optic supplies needed to perform ELT in the U.S. and Canada, including the identities of various suppliers, the status of negotiations, pricing, timelines and how they would impact EyeLight's ability to enter the U.S. market and compete, including competition with MLase;

h.   competitively sensitive information regarding EyeLight's negotiations with MLase and EyeLight's internal assessments of MLase's strategies and potential competitive plans; and

i.   detailed timelines, plans, and strategic analysis of EyeLight's effort to obtain FDA approvals, including conducting clinical trials of ELT in the U.S., and also including the identities of Key Opinion Leaders (KOL's), specific estimates of the numbers of patients that would be required for the clinical trials, timelines, logistics and costs to generate the patient data required for FDA approval, possible means and strategies for shortening the timeline for FDA approval and the pro's and cons of same, and other related proprietary information.

FIRST AMENDED COUNTERCLAIM

56.     For example, Dr. Berlin provided to Friedman on August 31, 2017 an extensive "slide deck" found at Dkt. 34-8 shortly after Friedman signed the Confidentiality Agreement.  In the slide deck, Dr. Berlin and EyeLight provided Friedman with comprehensive information regarding EyeLight's business, which they never would have provided to him but for his signing the Confidentiality Agreement, including the following:

a.  Detailed scientific and medical background on glaucoma, the abnormal trabecular meshwork that is the primary cause of the fluid outflow resistance that creates elevated intraocular pressure (IOP), and identification of points in the meshwork where pathology can be bypassed;

b.  Global and U.S. figures on the incidence of glaucoma and predicted growth;

c.  A comparison of current treatments for glaucoma and an explanation of why they are costly and often ineffective;

d.  An explanation of Minimally Invasive Glaucoma Surgery (MIGS), a comparison of current methods and devices and an overview of future devices under development;

e.  A detailed explanation of the ELT procedure and why it is safer and more effective than existing treatments for the most common forms of glaucoma;

f.  Charts, marked "Confidential," showing an analysis of data from patients who have undergone ELT and demonstrating the efficacy of the procedure as reflected in reduced post-operative IOP;

g.  A chart, marked "Confidential," comparing the efficacy of ELT to competing treatments;

h.  A detailed explanation of the equipment and supplies used for both Generation 1 and Generations 2 & 3 ELT;

FIRST AMENDED COUNTERCLAIM

i.  A slide, marked "Confidential," that provided an overview of EyeLight's FDA Regulatory Path including the identity of technologies already approved by the FDA which could serve as a predicate for EyeLight receiving FDA 510(k) approval, which would substantially shorten the time for approval as compared to other regulatory paths;

j.  A slide, marked "Confidential," providing an overview of the Generation 1 and Generation 2 delivery systems and the market potential that could be realized by implementation of the Generation 2 system;

k.  A detailed explanation of how the Generations 2 & 3 procedures differ from and are superior to the Generation 1 approach;

l.  An overview of EyeLight's IP and Patent portfolio and pipeline and plans for additional IP;

m. The roster of EyeLight's management team, project manager and business advisors; and

n.  Multiple slides identified as "Confidential," that provided a step-by-step financial, regulatory and business roadmap that EyeLight had formulated to obtain regulatory approval for and commercialize ELT, with corresponding planned investments required, for both Generation 1 and Generations 2 & 3 phases.

57.  On September 1, 2017, Friedman characterized such information that Counter-Plaintiffs provided to him pursuant to the Confidentiality Agreement as involving "lots of work and thought."

58.  Friedman requested further information regarding virtually every aspect of EyeLight's business and strategy on September 4, 2017 as follows:

"Probably best for just the two of us to meet initially---questions from the power point on: relationship with german manufacturer, clinical results vs. glaukos et al, current eu clinical results and installations,

FIRST AMENDED COUNTERCLAIM

510k or PMA pathways +labeling, time/expense for guided phase 2 development (per the grant), data from concept of phase 2 guided product, history of BD with Alcon et al, company structure/contributors and funding. I am a marketing/BD type but have found (the hard way) that critical details are what makes and breaks the success of new technologies."

59.    Friedman specifically stressed the importance of having a high level of detail with respect to the requested categories of information and Counter-Plaintiffs provided the requested information.

60.    On September 6, 2017, Dr. Berlin and EyeLight also provided Friedman with a lengthy, highly detailed draft grant proposal for his review and comment. A true and copy of the draft grant is found at Dkt. 34-16 and incorporated by reference herein.

61.    The draft grant proposal contained extensive information regarding Generation 3 ELT technology and procedures. It also identified the physicians who were participating in the study.

62.    Of particular note was a section of the draft proposal entitled "Detailed Research Plan and Milestones."   This section provided a detailed plan for researching and testing the Generation 3 technology.   It included detailed information on project costs for each step.

63.    The draft grant proposal gave Friedman a complete roadmap for testing the next generation of ELT technology.  This was information that Dr. Berlin and EyeLight, and their colleagues, had spent considerable time and effort developing. It would not have been revealed to Friedman had he not signed the Confidentiality Agreement.

64.    Illustrating the degree of Friedman's involvement with EyeLight, and the trust and confidence that Dr. Berlin and EyeLight reposed in him, on his own

initiative, Friedman suggested on September 28, 2017 that he identify himself to outside parties as EyeLight's Chief Executive Officer and began to do so.

65.     Dr. Berlin and EyeLight allowed Friedman to hold himself out as CEO based on Friedman's advice that it would give EyeLight credibility with prospective investors.

66.     After he signed the Confidentiality Agreement, Friedman was also privy to Dr. Berlin's "Business Notes" dated October 12, 2017. These were provided to Friedman in confidence.  The Business Notes set forth Dr. Berlin's confidential comments as to EyeLight's business, including comments relating to MLase.  A true and correct copy of these Business Notes are located at Dkt. 34-9 and incorporated by reference herein.

67.     The Business Notes also identified key, elite ophthalmologist specialists who were considered to be KOL's and whose endorsement of ELT was critical to developing the market for the procedure. The KOL's discussed in Dr. Berlin's Business Notes include names of specific KOL's with whom Dr. Berlin had been nurturing relationships for years in advance.

68.     Prior to signing the Confidentiality Agreement and working with Dr. Berlin and EyeLight, Friedman was not aware of these KOL's.

69.     During this initial relationship in 2017, Dr. Berlin introduced Friedman to MLase's principals.

70.     Friedman proposed that he be compensated for his work primarily in stock of EyeLight.  These terms were the subject of on-going discussions during the period that he worked with Dr. Berlin and EyeLight in September and October 2017, as well as when he returned for his second round with Dr. Berlin and EyeLight in 2018 as referenced below.

71.      By the end of October 2017, Friedman, Dr. Berlin and EyeLight were unable to reach an agreement. Their initial relationship had come to close.

FIRST AMENDED COUNTERCLAIM

## I.     Friedman's Late October 2017 Misrepresentations

72.     On October 27, 2017, Friedman emailed Dr. Berlin, assuring him "I care about my friends/associates, totally, and have never been anything except totally loyal."

73.     On October 31, 2017, Dr. Berlin emailed Friedman asking him to delete or return all of the confidential information Friedman had been provided and requested that Friedman not "meet, contact or speak to MLase."

74.     In response, Friedman represented that same day to Dr. Berlin and EyeLight, "No worries -- have deleted all emails and files re: your project. Assume you all have done the same with my work product."   A true and correct copy of this exchange is attached at Dkt. 171 at 4 and incorporated by reference herein.

75.     Friedman's October 31, 2017 assertion that he had "deleted all emails and files re: your project" was, unbeknownst to Dr. Berlin and EyeLight until after the filing of their original counterclaims on July 3, 2019,  a lie intended to allow him to retain Dr. Berlin and EyeLight's property and which caused Dr. Berlin and EyeLight to take no further action with respect to the materials Friedman had received to date;

76.     Had Friedman not lied to Dr. Berlin on October 31, 2017 and instead been truthful, Dr. Berlin and EyeLight would not have provided him the information they did after October 31, 2017 and/or further educated Friedman.

77.     Friedman knew that his October 31, 2017 representation to Dr. Berlin and EyeLight was false.

78.     Friedman intended for Dr. Berlin and EyeLight to rely on that misrepresentation and allow him to retain the property he claimed to have deleted.

79.     Indeed, after Dr. Berlin and EyeLight forwarded him additional information starting on or about February 2, 2018 as referenced below, he did not correct his October 31, 2017 misrepresentation to Dr. Berlin and EyeLight.

**J.      Second Relationship in 2018**

80.     In late 2017, EyeLight's Chief Technical Officer, Michael Matallana, died. He had been involved in EyeLight's efforts to build its own excimer lasers.

81.     Dr. Patrick Hodara, who had brought Friedman to Dr. Berlin and EyeLight initially, persuaded Dr. Berlin to again reach out to Friedman.   On February 2, 2018, Dr. Berlin sent Friedman an email labeled "CONFIDENTIAL" with, among other things, an updated slide deck.   A true and correct copy of this email and its attachments is found at Dkt. 99-18 and incorporated by reference herein.   The accompanying spreadsheets included, among other things, detailed schedules and the associated projected costs for developing EyeLight's own excimer lasers.

82.     On February 23, 2018, Dr. Berlin provided Friedman with another updated version of EyeLight's slide deck.   A true and correct copy of this deck is found at Dkt. 99-22 and incorporated by reference herein.

83.     Dr. Berlin and EyeLight's Advisory Board discussed with Friedman a potential framework and terms for a transaction with MLase to obtain lasers from MLase.

84.     On or about March 6, 2018, Friedman traveled to Munich, Germany and personally met with the key representatives of MLase on EyeLight's behalf. Friedman subsequently reported to Berlin and the EyeLight Advisory Board on the visit and emphasized the confidential nature of this discussion and his report, instructing "not to send to anyone please."   He was critical of MLase's history and prospects in that report.

85.     On March 7, 2018, Friedman estimated that EyeLight was 75-80% complete on buying MLase for a reasonable price.

86.     Dr. Berlin, EyeLight, EyeLight's Advisory Board and Friedman then began working on a draft term sheet.

87.     On or about April 6, 2018, Friedman and a member of EyeLight's Advisory Board traveled to Germany to again meet with MLase's representatives there. Negotiations further ensued over the coming weeks with EyeLight and MLase exchanging proposals.

88.     On May 9, 2018, the day before a planned board meeting to evaluate MLase's latest proposal, Dr. Berlin asked Friedman to prepare detailed materials on a variety of topics.

89.     Friedman then cancelled a dinner with Dr. Berlin planned for that same night, telling Dr. Berlin the reason for cancellation was to enable him to have time to prepare the documents that Dr. Berlin had requested  Friedman to present at the board meeting scheduled for the morning of May 10, 2018.

90.     EyeLight's Board convened at the planned meeting time on May 10, 2018.  Friedman did not attend.

91.     By May 10, 2018, it was apparent that this phase of Friedman's work with Dr. Berlin and EyeLight had come to a close.

92.     In late June 2018, they separated following some separate work on the sale of certain patents.  That work and those patents are not the subject of this action.

**K.     Friedman Then Immediately Forms ELT Sight**

93.     After the second relationship in 2018 ended, on June 30, 2018, Friedman formed a new company, Glokoma, Inc., which he later renamed ELT Sight.

94.     Around this time, Friedman had reached out to representatives of MLase regarding a collaboration with this new company.

95.   Friedman proposed no later than September 2018 that MLase transfer its ELT business assets to Glakoma and, among other things, Friedman and MLase would each hold 50% equity interests in this new company.

96.   Around this same time, unaware of Friedman's discussions with MLase, Dr. Berlin again reached out to MLase. MLase reported this to Friedman.

97.   Knowing that his actions with MLase were wrong, Friedman advised MLase's Chief Executive Officer, Johannes Junger, on or about September 16, 2018 to mislead Dr. Berlin by telling Mr. Junger to advise Dr. Berlin that "MLase partners aren't currently sure of direction."

98.   Mr. Junger then proceeded to suggest to Dr. Berlin that a transaction between EyeLight and MLase was still possible and, as directed by Friedman, did not disclose the Friedman/MLase plans to Dr. Berlin.

99.   Friedman and MLase then proceeded as partners in ELT Sight as described above with Dr. Berlin purposefully kept unaware of this effort by Friedman.

100.   Meanwhile, in addition to directing MLase to mislead Dr. Berlin, Friedman used a combination of deception and non-disclosure agreements to covertly advance the interests of ELT Sight.

101.   For example, during the time Friedman was working as an EyeLight representative, nominally its "CEO", Dr. Berlin and EyeLight had introduced Friedman to a specific European Key Opinion Leader (KOL), one of the leading European ophthalmologists whom Dr. Berlin had personally trained in ELT surgery, and shared with Friedman a confidential report on ELT drafted by that ophthalmologist.

102.   On or about May 23, 2019, this KOL ophthalmologist contacted Dr. Berlin, and stated specifically that he had wanted to tell this news to Dr. Berlin far earlier but could not due to a non-disclosure agreement he had signed with ELT Sight which precluded him from speaking.  Because the ELT Sight website "went

- 18 -

live", he could now speak.   He reported to Dr. Berlin that he had been contacted by an MLase representative on behalf of ELT Sight months earlier and offered a contract to work representing ELT Sight.  According to this ophthalmologist, he was led to believe that ELT Sight was EyeLight and he agreed to work with them because he was confused and led to believe that ELT Sight was Dr. Berlin's company.  He subsequently learned otherwise, but could not tell this to Dr. Berlin until the ELT Sight website went public.

103.   ELT Sight's website subsequently identified Friedman as ELT Sight's Chief Executive Officer and a number of MLase's representatives as the Management Team. All such representatives were previously officers, directors or employees of MLase.

104.   On May 24, 2019, Dr. Berlin and EyeLight, through their counsel, sent correspondence to Friedman demanding, among other things, and others notifying them that the ELT Sight demanding, among other things, that they cease and desist their conduct and return any and all confidential information in their possession.

105.   Friedman and ELT Sight refused.

106.   Friedman and ELT Sight then commenced this lawsuit, and their June 25, 2019 complaint seeks a declaration that Friedman did not breach the Confidentiality Agreement.

107.   Only later, on or about September 9, 2020, did Friedman and ELT Sight submit a "Document Log" found at Dkt. 173 and incorporated by reference herein identifying (apart from a number of documents not relevant to this dispute) a large number of improperly retained materials which Friedman failed to return or destroy in breach of the Confidentiality Agreement and the vast majority of which he obtained from Dr. Berlin and EyeLight after October 31, 2017.

108.   Friedman improperly used Dr. Berlin and EyeLight's trade secrets, confidential and proprietary information and other information in his dealings with MLase after May 10, 2019, in the creation of ELT Sight and  in the course of ELT

Sight's business, including, but not limited to, furthering ELT Sight's acquisition prospects and soliciting acquisition representatives about whom Friedman previously learned trade secret and confidential and proprietary information.

109.   Dr. Berlin and EyeLight have been irreparably harmed by Friedman and ELT Sight's conduct as set forth herein.  They also lack an adequate remedy at law for purposes of obtaining complete relief, and the balance of hardships are in their favor and the issuance of a permanent injunction is in the public interest.

## COUNT I – VIOLATION OF DEFEND TRADE SECRETS ACT

110.   Dr. Berlin and EyeLight re-allege and incorporate by reference the allegations contained in paragraphs 1 through 71 and paragraphs 80 through 109 above as though fully set forth herein.

111.   Counter-Defendants' misconduct has violated and continues to violate the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*. ("DTSA").

112.   Dr. Berlin and EyeLight disclosed information to Friedman, which information is now in the possession ELT Sight due to Friedman's status as its CEO, that constitute trade secrets pursuant to the DTSA.

113.   Dr. Berlin and EyeLight's trade secrets relate to products and services used in, or intended for use in, interstate or foreign commerce.

114.   Dr. Berlin and EyeLight's trade secrets have actual and potential economic value by virtue of not being known to competitors and others who can obtain economic value from their disclosure or use.

115.   The trade secrets provide Counter-Defendants with an unfair competitive advantage in that they will compete knowing all of the inside information to which Friedman had access during his time with EyeLight, including without limitation certain information regarding EyeLight's business plan, patent strategy, regulatory strategy, potential investors, business partners, scientific advisors, and other forms of trade secret information described herein.  Some of this information relates directly to EyeLight's strategy for competing with MLase and/or

FIRST AMENDED COUNTERCLAIM

to attempt to negotiate a purchase or other business arrangement with MLase which Friedman.

116. Dr. Berlin and EyeLight's trade secrets provide them with a competitive advantage in the effort to commercialize ELT and its related technology.

117. Dr. Berlin and EyeLight developed their trade secrets through substantial expenditures of significant resources over many years.

118. Dr. Berlin and EyeLight made reasonable efforts to maintain the confidentiality of their trade secrets.

119. Through the conduct alleged herein, Counter-Defendants misappropriated Dr. Berlin and EyeLight's  trade secrets.

120. Counter-Defendants acquired Dr. Berlin and EyeLight's  trade secrets by improper means and under circumstances giving rise to a duty to maintain the information's secrecy.

121.  Counter-Defendants have used and disclosed the trade secrets without Dr. Berlin and EyeLight's consent.

122. Dr. Berlin and EyeLight have been damaged by Counter-Defendants' violations of the DTSA.

123. Counter-Defendants have been notified of Dr. Berlin and EyeLight's claims of trade secret misappropriation, but have not agreed to cease or desist in the use of it.

124. Counter-Defendants have been unjustly enriched by and through their misappropriation of Dr. Berlin and EyeLight's trade secret information.

125. Counter-Defendants' acts of misappropriation were and are willful and malicious.

## COUNT II - MISAPPROPRIATION OF TRADE SECRETS UNDER CALIFORNIA UNIFORM TRADE SECRETS ACT

126.   Dr. Berlin and EyeLight re-allege and incorporate by reference the allegations contained in paragraphs 1 through 71 and paragraphs 80 through 109 above as though fully set forth herein.

127.   Counter-Defendants' misconduct as alleged herein has violated and continues to violate the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 *et seq*. ("CUTSA").

128.   Certain information disclosed to Counter-Defendants Friedman and Qi Jian Funds, and which is now in the possession ELT Sight due to Friedman's status as its CEO, constitute trade secrets pursuant to the CUTSA.

129.   Dr. Berlin and EyeLight's trade secrets have actual and potential economic value by virtue of not being known to competitors and others who can obtain economic value from their disclosure or use.

130.   The trade secrets provide Counter-Defendants with an unfair competitive advantage in that they will compete knowing all of the inside information to which Friedman had access during his time with EyeLight, including without limitation certain information regarding EyeLight's business plan, patent strategy, regulatory strategy, potential investors, business partners, scientific advisors, and other forms of trade secret information described herein.  Some of this information relates directly to EyeLight's strategy for competing with MLase and/or to attempt to negotiate a purchase or other business arrangement with MLase.

131.   Dr. Berlin and EyeLight's trade secrets provide them with a competitive advantage in the effort to commercialize ELT and its related technology.

132.   Dr. Berlin and EyeLight developed their trade secrets through substantial expenditures of significant resources over many years.

133.   Dr. Berlin and EyeLight made reasonable efforts to maintain the confidentiality of their trade secrets.

134.   Through the conduct alleged herein, Counter-Defendants misappropriated Dr. Berlin and EyeLight's  trade secrets.

135.   Counter-Defendants acquired Dr. Berlin and EyeLight's  trade secrets by improper means and under circumstances giving rise to a duty to maintain the information's secrecy.

136.   Counter-Defendants have used and disclosed the trade secrets without Dr. Berlin and EyeLight's consent.

137.   Dr. Berlin and EyeLight have been damaged by Counter-Defendants' violations of CUTSA.

138.   Counter-Defendants have been notified of Dr. Berlin and EyeLight's claims of trade secret misappropriation, but have not agreed to cease or desist in the use of it.

139.   Counter-Defendants have been unjustly enriched by and through their misappropriation of Dr. Berlin and EyeLight's trade secret information.

140.   Counter-Defendants acts of misappropriation were and are willful and malicious.

### COUNT III - BREACH OF CONFIDENTIALITY AGREEMENT (AGAINST FRIEDMAN ONLY)

141.   Dr. Berlin and EyeLight re-allege and incorporate by reference the allegations contained in paragraphs 1 through 71 and paragraphs 80 through 109 above as though fully set forth herein.

142.   Friedman breached the Confidentiality Agreement by improperly using, disclosing, and misappropriating "Confidential Information" as defined in the Confidentiality Agreement for purposes other than permitted by the Confidentiality Agreement.

143.   Friedman breached the Confidentiality Agreement  by failing to return and/or destroy "Confidential Information" as defined in the Confidentiality Agreement.

144.   Friedman's breaches were a substantial factor in causing Dr. Berlin and EyeLight's harms.

145.   Dr. Berlin and EyeLight have satisfied any and all conditions precedent to this claim and did all, or substantially all, of the things required of them by the Confidentiality Agreement.

## COUNT IV - FINANCIAL ELDER ABUSE (AGAINST FRIEDMAN ONLY)

146.   Dr. Berlin realleges and incorporates by reference the allegations contained in paragraphs 1 through 109 above as though fully set forth herein.

147.   Dr. Berlin was over sixty-five years of age at the time the events alleged herein took place.

148.   Friedman has engaged in financial elder abuse pursuant to Section 15610.30 of the California Welfare and Institutions Code.

149.   After October 31, 2017 and February 2, 2018, Friedman wrongfully and intentionally deprived Dr. Berlin in rights to personal property.

150.   Friedman is engaged in a wrongful use of such property.

151.   Friedman knew that his conduct was likely to be harmful to Dr. Berlin.

152.   Between October 31, 2017 and his second relationship with Dr. Berlin and EyeLight commencing on or about February 2, 2018, Friedman did not form ELT Sight or its predecessor.

153.   But for his fraudulently induced second relationship in 2018 with Dr. Berlin and EyeLight, Friedman would not have formed ELT Sight and ELT Sight would not be competing with Dr. Berlin and Eye Light for KOL's, investors and commercial or acquisition partners in the United States.

154.   Friedman engaged in recklessness, oppression, fraud, or malice in the commission of the abuse.

## <u>COUNT V – VIOLATION OF CALIFORNIA PENAL CODE §496</u>

207.   Dr. Berlin and EyeLight reallege and incorporate by reference the allegations contained in paragraphs 1 through 109 above as though fully set forth herein.

208.   After October 31, 2017 and February 2, 2018 Friedman took and received property, labor and service from Dr. Berlin and EyeLight knowingly and designedly obtained by his theft as prohibited in California Penal Code §484(a) (which includes the use of false representations and false pretenses).

209.   ELT sight has also received such property, labor and service knowing that such items had been obtained in a manner constituting theft, false representations and false pretenses as set forth above.

210.   Between October 31, 2017 and his second relationship with Dr. Berlin and EyeLight commencing on or about February 2, 2018, Friedman did not form ELT Sight or its predecessor.

211.   But for his fraudulently induced second relationship in 2018 with Dr. Berlin and EyeLight, Friedman would not have formed ELT Sight and ELT Sight would not be competing with Dr. Berlin and EyeLight for KOL's, investors and commercial or acquisition partners in the United States.

212.   Dr. Berlin and EyeLight have been damaged by Counter-Defendants' violation of California Penal Code §496, and are entitled to treble damages, the costs of suit, and attorneys' fees under § 496(c).

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Dr. Berlin and EyeLight, Inc. respectfully request the entry of judgment in their favor and against Counter-Defendants Elliot Friedman and ELT Sight, Inc., and the following relief:

1.   Compensatory damages in an amount to be proven at trial;

2. Restitution in the amount of the value of Friedman's interests in ELT Sight, in whole or in part, and the value of the information taken from Dr. Berlin and EyeLight, in amount to be proven at trial;

3. The imposition of a constructive trust on Elliot Friedman's interests in ELT Sight, in whole or in part, and the remaining equity interests in ELT Sight;

4. Punitive or exemplary damages;

5. Treble damages pursuant to Cal. Pen. Code § 496(c);

6. The entry of a permanent injunction enjoining Friedman and ELT Sight from any and all actions and efforts which, in whole or in part, are derived from Friedman's 2018 relationship with Dr. Berlin and Eye Light;

7. Pre-judgment and post- judgment interest as applicable;

8. Payment of Dr. Berlin and EyeLight's attorney's fees, costs, and disbursements;

9. Such further relief deemed just and equitable by the Court.

## **DEMAND FOR JURY TRIAL**

In accordance with Federal Rule of Civil Procedure 38(b), Dr. Berlin and EyeLight demand a trial by jury on all issues so triable.

Dated: February 2, 2021

**LEONARDMEYER LLP**
Derek J. Meyer (State Bar No. 278346)
10250 Constellation Blvd., 14th Floor
Los Angeles, CA 90067
Tel: (310) 220-0331
rmeyer@leonardmeyerllp.com

*Counsel for Counter-Plaintiffs*
*Michael S. Berlin, M.D. and EyeLight, Inc.*

- 26 -

**CERTIFICATE OF SERVICE**

I am over the age of 18 and not a party to the within action; I am employed by LeonardMeyer LLP in the County of Los Angeles, California at 10250 Constellation Blvd., 14th Floor, Los Angeles, CA 90067.

On February 2, 2021, I served the foregoing document(s) described as:

**FIRST AMENDED COUNTERCLAIM**

on the interested parties in this action by:

[X]   **By CM/ECF:** I hereby certify that on this date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail notice list, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants (if any) indicated on the Manual Notice list.

[X]   **(Federal)** I declare under penalty of perjury under the laws of the State of California and under the laws of the United States of America that the above is true and correct.

Executed on February 2, 2021, at Los Angeles, California.

_/s/ Derek J. Meyer_

Derek J. Meyer